SO ORDERED,

Judge Neil P. Olack
United States Bankruptcy Judge
Date Signed: February 19, 2016

**The Order of the Court is set forth below. The docket reflects the date entered.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

| | |
|---|---|
| **VALERIE DENISE NICKELSON,** | **CASE NO. 15-01271-NPO** |
| **DEBTOR.** | **CHAPTER 13** |
| **VALERIE DENISE NICKELSON** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 15-00046-NPO** |
| **FRANKLIN CHECK SERVICE, LLC AND JOHN LAIRD** | **DEFENDANTS** |

### MEMORANDUM OPINION AND ORDER
### ON COMPLAINT AND MOTION TO LIFT AUTOMATIC STAY

This matter came before the Court for trial (the "Trial") on January 13, 2016 on the Complaint (the "Complaint") (Adv. Dkt. 1)[1] filed by Valerie Denise Nickelson (the "Debtor") against Franklin Check Service, LLC ("Franklin Check Service") and John Laird ("Laird" or together with Franklin Check Service, the "Defendants") in the Adversary.  Also before the Court was the Motion to Lift Automatic Stay (the "Motion to Lift Stay") (Bankr. Dkt. 24) filed by Laird and Response to Motion to Lift Automatic Stay (Bankr. Dkt. 35) filed by the Debtor in

---

[1]  Citations to docket entries in the above-referenced adversary proceeding (the "Adversary") are cited as (Adv. Dkt. ____)" and citations to docket entries in the above-styled bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. ____)".

the Bankruptcy Case. At Trial, the Debtor was represented by Thomas Carl Rollins, Jr., and the

Defendants were represented by Kenneth T. O'Cain. The Pretrial Order for Adversary

Proceeding 15-00046-NPO, Motion to Lift Automatic Stay, Response to Motion to Lift

Automatic Stay, and Order Consolidating Motion to Lift Automatic Stay and Response to

Motion to Lift Automatic Stay with Adversary Proceeding (the "Pretrial Order") (Adv. Dkt. 29)

was entered on January 11, 2016. By stipulation, sixteen (16) joint exhibits were introduced into

evidence at Trial, and four (4) additional exhibits were introduced into evidence by the Debtor.[2]

Having considered the pleadings, exhibits, and testimony presented at Trial, the Court finds as

follows:[3]

## Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this proceeding

pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(E) and (H).

Additionally, the parties have consented to the entry of a final judgment by this Court. (Pretrial

Order at 2). Notice of the Trial was proper under the circumstances.

## Facts

The facts in the following introductory paragraphs are derived from the joint stipulations

in the Pretrial Order and the undisputed testimony at Trial. On July 20, 2014, the Debtor

purchased a mobile home for $8,700.00. (Debtor Ex. 1). Shortly thereafter, the mobile home

---

[2] The joint exhibits are cited as "(Jt. Ex. _____)", and the Debtor's exhibits are cited as
"(Debtor Ex. _____)". To avoid confusion, the citations are to the exhibit numbers that appear on
the stickers affixed to the documents by the parties in accordance with the Pretrial Order.
(Pretrial Order at 10). Because some of the premarked documents were not introduced into
evidence at Trial, the exhibit numbers are not consecutive.

[3] Pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, the following
constitutes the findings of fact and conclusions of law of the Court.

was moved to its present location on land owned by the Debtor's parents at 5075 McNair Road NW in Roxie, Mississippi, and the Debtor and her two (2) children have lived there since then.

In need of funds, the Debtor went to Franklin Check Service on December 18, 2014 to obtain a title loan on the mobile home. Franklin Check Service is a limited liability company wholly owned by Laird and is located in Franklin County, Meadville, Mississippi, not far from the Debtor's home. As a consumer financial services business, Franklin Check Service provides title loans, payday loans, and bill payment services. In addition, Laird operates an automotive repair shop, Laird's Body Shop, at the same location.

Title loan services in Mississippi are subject to the Mississippi Title Pledge Act, MISS. CODE ANN. §§ 75-67-401 to -449, and are licensed and regulated by the Mississippi Department of Banking and Consumer Finance (the "Banking Department"). In a title loan transaction, the customer signs a "title pledge agreement" and agrees to give title to unencumbered personal property (usually an automobile) as security for a loan. MISS. CODE ANN. § 75-67-403(h). The title pledge agreement is a thirty (30)-day written agreement renewable for thirty (30)-day periods. MISS. CODE ANN. § 75-67-413(3). A title pledge lender may receive a service charge in lieu of interest or other charges that does not exceed twenty-five percent (25%) of the principal amount, per month, advanced in the title pledge transaction. MISS. CODE ANN. § 75-67-413(1).

At the time of the transaction in question, Valerie Delozier ("Delozier") was Franklin Check Service's sole employee. Delozier testified at Trial that during her three (3) to four (4) years of employment there, she handled the paperwork for all payday loans, title loans, and bill payment services provided by Franklin Check Service. She also answered the telephone for Laird's Body Shop. She stated at Trial that she recently left Franklin Check Service for a job that offered health insurance.

When the Debtor arrived at Franklin Check Service on December 18, 2014, she spoke with both Laird and Delozier about obtaining a title loan on the mobile home. Laird asked, and the Debtor agreed to allow him, to inspect the exterior of the mobile home. When they returned to the office, the Debtor signed several documents. At some point, Delozier gave the Debtor a spreadsheet dated December 19, 2014 that listed $2,500.00 as the principal amount of a title loan, the amount of interest owed if the title loan were repaid in full by either January 20, February 20, or March 20, and the total amount of principal and interest due if paid in full by January 20 (the "Loan Spreadsheet") (Debtor Ex. 3). The next day, December 19, 2014, Laird handed the Debtor a check in the amount of $2,500.00[4] (Jt. Ex. 3), the Debtor endorsed the check to Laird, and Laird gave the Debtor $2,500.00 in cash. The Debtor then gave Laird the original Certificate of Title to the mobile home. Except for these bare facts, the Debtor and the Defendants disagree about every other aspect of the transaction involving the mobile home. Was the nature of the transaction a loan or a sale? Whereas the Debtor insisted that she obtained a title loan on the mobile home from Franklin Check Service, the Defendants maintained that she sold the mobile home to Laird.

**Debtor's Testimony**

The Debtor testified at the Hearing that she never agreed to sell the mobile home to Laird. She admitted giving Laird or Delozier the Certificate of Title to the mobile home (Jt. Ex. 2) but claimed she did so only in connection with the title loan. She recalled signing a promissory note as part of the title loan transaction but did not remember signing a bill of sale. She agreed that she endorsed a $2,500.00 check made payable to her, but she insisted that nothing on the check indicated a sale of the mobile home when Laird presented it to her.

---

[4] The cash amount of $2,500.00 is the maximum amount allowed under state law for title loans. MISS. CODE ANN. § 75-67-415(f).

According to the Debtor, the words, "Trailer Buy 2000 M. Home," which appear above the memo line on the copy of the check introduced into evidence, were added by either Laird or Delozier *after* she endorsed the check. She stated that she did not receive a copy of the promissory note but did receive a copy of the Loan Spreadsheet, which she maintained constituted evidence of a title loan. The schedule of interest payments shown in the Loan Spreadsheet, according to the Debtor, were consistent with two (2) handwritten receipts that she produced at Trial indicating that she made two (2) payments to Franklin Check Service: $200.00 on February 2, 2015, and $300.00 on March 22, 2015. (Debtor Ex. 4). The receipt dated March 22, 2015, shows a balance due of $3,687.50. The Debtor pointed out that if she had sold the mobile home to Laird, there would have been no reason for her to make these loan payments to Franklin Check Service. In that regard, although she admitted entering into a payday loan with Franklin Check Service, she insisted that she had repaid that loan in full several years ago. The Debtor's testimony regarding the nature of the transaction was supported by the testimony of her father David Sanders, Sr., who stated that he had known Laird for years and that Laird complained to him sometime after December 19, 2014 that he had loaned money to the Debtor which she had not yet repaid.

At Trial, the Debtor valued the mobile home between $10,000.00 to $12,000.00 at the time of the transaction. She described the condition of the mobile home as "fair" when she first purchased it for $8,700.00 on July 20, 2014, but she stated that its value increased after she made certain repairs, including painting the walls and caulking the interior.

**Laird's Testimony**

Laird testified at Trial that he purchased the mobile home from the Debtor for the lump sum of $2,500.00, and, in exchange, she signed the Certificate of Title to the mobile home and a

Bill of Sale dated December 18, 2014 (the "Dec. 18 Bill of Sale") (Jt. Ex 1).  Because of the issues raised by the Debtor concerning the validity of the Dec. 18 Bill of Sale, the Court pauses here to provide a brief description.  The Dec. 18 Bill of Sale consists of a one-page preprinted form with several blank lines filled out in handwriting.  At the bottom of the page, the handwritten date "12/18/2014" appears in two (2) places.  These two (2) dates, however, appear to have been changed from "12/19/2014" to "12/18/2014."  Near the top, the Debtor is identified as the seller, and Laird, as the buyer.  No other individual or entity is mentioned in the Dec. 18 Bill of Sale.  The substantive middle paragraph, with the handwritten portion shown in italics, provides:

> The Seller hereby grants transfer or sale of the following goods:
>
> *Pion. Lee Mobile Home 2000*
> *P#3408LA1677AB*
> *Will Keep Insurance on It Till Picked Up*
>
> to the Seller [*sic*] in exchange for _____ in the amount of *$2,500.00*.

(Jt. Ex. 1).

Although the transaction took place at Franklin Check Service, Laird testified at Trial that Franklin Check Service was not a party to the sale.  To support his testimony, Laird produced a copy of the $2,500.00 check made payable to the Debtor.  (Jt. Ex. 3).  The check, dated December 19, 2014, is drawn on the account of "John Marion Laird d/b/a Laird's Body Shop," not Franklin Check Service.  As noted previously, the description, "Trailer Buy 2000 M. Home," is handwritten above the memo line of the check.  On the back of the check the Debtor's signature appears below the "ENDORSE HERE" language.  Thus, based on the Dec. 18 Bill of Sale and $2,500.00 check, Laird claimed that the only parties to the sale of the mobile home were himself, the Debtor, and Laird's Body Shop.  Laird did not attempt to explain how the

purchase of the mobile home served any business purpose of Laird's Body Shop. To the contrary, he testified that he intended to sell the mobile home at a profit for his own benefit.

Laird admitted that on December 18, 2014, both he and Delozier talked with the Debtor about the possibility of Franklin Check Service granting her a title loan on the mobile home. He testified, however, that he was unsure at that time whether state law permitted title loans on mobile homes. He called the Banking Department, the licensing and regulatory agency of the Mississippi Title Pledge Act, for clarification on the matter.

While waiting for the Banking Department to contact him, Laird continued to speak with the Debtor about the potential terms of a $2,500.00 title loan, and Delozier created the Loan Spreadsheet in the context of their discussion. Laird, however, insisted that the Loan Spreadsheet was for demonstration purposes only. Moreover, Laird testified that the Loan Spreadsheet actually showed that Franklin Check Service abandoned the possibility of entering into a title loan on the mobile home because it did not include a full schedule of interest payments but stopped at March 20. Delozier's testimony was consistent with Laird's regarding the significance of the Loan Spreadsheet. Although Delozier testified that such spreadsheets generally are filled out in connection with a title loan, never with a sale, she also stated that nothing on the Loan Spreadsheet indicated to her that the title loan had closed.

Regardless of the significance of the Loan Spreadsheet, Laird admitted that on December 18, 2014, he told the Debtor that they could "work something out." According to Laird, she signed the Dec. 18 Bill of Sale and turned the Certificate of Title to the mobile home over to him. He then told her to return to the office the next day. Either later that same day or the next day, the Banking Department informed Laird that state law prohibited Franklin Check Service from entering into a title loan on a mobile home. Laird testified that when the Debtor returned to

Franklin Check Service on December 19, 2014, he explained to her that granting a title loan on the mobile home would jeopardize his title loan license and offered instead to buy the mobile home for $2,500.00 (the same amount as the title loan requested by the Debtor).  According to Laird, the Debtor accepted his offer.  Laird then wrote her the $2,500.00 check.

With respect to the two (2) receipts showing payments by the Debtor to Franklin Check Service of $200.00 and $300.00 on February 2, 2015 and March 22, 2015, Laird testified that the payments were for an outstanding payday loan entered into between Franklin Check Service and the Debtor in either 2013 or 2014, prior to the transaction involving the mobile home.  Delozier testified that she recognized her signature on the February 2, 2015 receipt but not on the March 22, 2015 receipt.  She opined that the February 2, 2015 receipt was for payment by the Debtor of a payday loan granted sometime in February 2013.[5]  Delozier could not explain why Franklin Check Service waited two (2) years for payment on a thirty (30)-day payday loan or why the form of these receipts did not match those generated by Franklin Check Service's computer.

_____

[5] During the Trial, the Court sustained the Debtor's objection to testimony of Delozier that the Debtor had entered into several other payday loans with Franklin Check Service beginning in 2011 on the ground that her testimony was based on a loan file not produced in discovery but obtained by Delozier from Laird the morning of the Trial (without the knowledge of the Defendants' counsel) and also because it conflicted with Laird's answer to Interrogatory No. 13:

> **Interrogatory No. 13:**  Identify any and all loans you or Franklin Check Service have or have made in the past to Valerie Nickelson, Plaintiff herein.

> **Answer**:  I [*sic*] have not made Valerie Nickelson any loans in the past.

(Jt. Ex. 21).  Although Franklin Check Service and Laird argued that their answer was correct as to Laird, the Court finds that the question clearly pertained to both Laird and Franklin Check Service, and, therefore, the answer was incomplete and evasive.  For that reason and because of the Defendants' failure to produce the loan file, the Court sustained the objection to testimony that the Debtor received any payday loans from Franklin Check Service other than the single payday loan mentioned by Delozier in her deposition testimony prior to Trial.  *See* FED. R. BANKR. P. 7026(g)(3), 7037(a)(4), 7037(c)(1).

**Bankruptcy Case**

On April 17, 2015, the Debtor filed a petition for relief (the "Petition") (Bankr. Dkt. 1) pursuant to chapter 13 of the Bankruptcy Code.[6]  The Debtor listed the mobile home as personal property having a current value of $28,000.00[7] in Schedule B-Personal Property ("Schedule B") (Jt. Ex. 5; Bankr. Dkt. 4 at 6).  She claimed the mobile home as exempt property under MISS. CODE ANN. § 85-3-1(d) on Schedule C-Property Claimed as Exempt (Jt. Ex. 6; Bankr. Dkt. 4 at 7).  She listed Franklin Check Service as a secured creditor having a claim valued at $3,687.00 on Schedule D-Creditors Holding Secured Claims ("Schedule D") (Jt. Ex. 7; Bankr. Dkt. 4 at 8). (The claim amount of $3,687.00 is almost the same as the balance shown on the March 22, 2015 receipt. (Debtor Ex. 4)).  Later, on June 25, 2015, the Debtor amended Schedule D to add Laird for notice purposes.  (Bankr. Dkt. 36).  In Schedule J: Your Expenses (Jt. Ex. 8; Bankr. Dkt. 4 at 19-20), she listed monthly expenses of $1,872.89 and a monthly net income of $2,162.11.  In her chapter 13 plan (the "Plan") (Bankr. Dkt. 2), filed contemporaneously with the Petition, the Debtor proposed to pay Franklin Check Service the amount owed of $3,687.00 at an annual interest rate of five percent (5%), and valued the mobile home at $10,000.00.  She proposed to pay nothing to her unsecured creditors.

When he received notice of the bankruptcy filing through Franklin Check Service, Laird contacted a bankruptcy lawyer, Jack Lazarus ("Lazarus"), for advice as to whether the mobile home constituted property of the Debtor's bankruptcy estate.  For that purpose, Delozier sent Lazarus a bill of sale dated December 19, 2014 (the "Dec. 19 Bill of Sale") (Debtor Ex. 5),

---

[6] Hereinafter, the "Code" refers to the United States Bankruptcy Code found at title 11 of the United States Code, and all code sections refer to the Code unless otherwise noted.

[7] Although the Debtor listed the value of the mobile home at $28,000.00 in Schedule B, she admitted at Trial that she had no basis for arriving at that figure.

purportedly regarding the same transaction reflected in the Dec. 18 Bill of Sale. (Pretrial Order at 8).  In deposition testimony, Lazarus identified the Dec. 19 Bill of Sale as the copy that Delozier provided him and that he forwarded to the Debtor's counsel on April 23, 2015 in an attempt to resolve the parties' dispute regarding the ownership of the mobile home.  (Jt. Ex. 20).

The Dec. 19 Bill of Sale differs from the Dec. 18 Bill of Sale in three (3) ways.  First, the Dec. 19 Bill of Sale does not list the Debtor's name as the "Seller" in the first paragraph. Instead, the line for the seller's name is left blank.  The Debtor's signature, however, appears near the bottom of the page above the line marked "seller."  Second, the date next to the Debtor's signature near the bottom of the Dec. 19 Bill of Sale is "12/19/14," not "12/18/14."  This same date in the Dec. 18 Bill of Sale appears to have been altered.  Third, the date next to Laird's signature in the Dec. 19 Bill of Sale is left blank.  At Trial, Laird denied altering the Dec. 18 Bill of Sale.  Delozier testified that she may have added the Debtor's name in the first paragraph of the Dec. 18 Bill of Sale and the date next to Laird's signature at the bottom, but she too denied altering the Dec. 18 Bill of Sale.

## A.    Motion to Extend Stay

The Debtor filed a chapter 13 bankruptcy case on February 10, 2012, which was dismissed on June 25, 2014 because of her failure to make plan payments.  Because of the dismissal of her prior bankruptcy case, the automatic stay with respect to the Debtor would have expired thirty (30) days after the filing of the current Petition by virtue of § 362(c)(3)(A). Therefore, on April 20, 2015, the Debtor filed a Motion to Extend Automatic Stay (the "Motion to Extend Stay") (Bankr. Dkt. 8) asking the Court, pursuant to § 362(c)(3)(B), to continue the automatic stay as to all of the Debtor's creditors throughout the duration of the Bankruptcy Case. Laird filed a Response to Motion to Extend Automatic Stay (the "Response to Motion to Extend

Stay") (Bankr. Dkt. 16) in which he opposed the continuation of the stay on the ground the Debtor could not demonstrate that the current Bankruptcy Case was filed in good faith. Laird attached the Dec. 18 Bill of Sale as an exhibit to the Response to Motion to Extend Stay and argued that the Debtor acted in bad faith by including the mobile home in her proposed Plan, treating Franklin Check Service as a secured creditor, and claiming the mobile home as exempt property when she had no equity or ownership interest in the mobile home.

At the hearing on the Motion to Extend Stay on May 11, 2015, the Debtor testified she had never before seen the Dec. 18 Bill of Sale. Based on the Debtor's testimony regarding the reason why her prior bankruptcy case was dismissed and her current employment status, the Court found that she rebutted the presumption of bad faith and entered the Order Granting the Motion to Extend Automatic Stay (Bankr. Dkt. 19) on May 13, 2015. The Court made no findings regarding the merits of the dispute between the Debtor and Laird as to the ownership of the mobile home or the validity of the Dec. 18 Bill of Sale.

**B.      Motion to Lift Stay**

On May 21, 2015, Laird filed the Motion to Lift Stay alleging that he purchased the mobile home from the Debtor and asking the Court to lift the automatic stay to allow him to proceed against her in state court for replevin and/or eviction. In an attempt to prove his ownership interest, Laird attached as exhibits to the Motion to Lift Stay the Dec. 18 Bill of Sale and a copy of the $2,500.00 check made payable to the Debtor. (Bankr. Dkt. 24, Exs. A-B). He also complained in the Motion to Lift Stay that the Debtor had not named him as the loss payee in her insurance policy covering the mobile home. (Mot. to Lift Stay at 2). On May 22, 2015 and again on July 7, 2015, the Court entered an Order Extending Stay (Bankr. Dkt. 25 & 41) until the conclusion of the final hearing and a determination by the Court on the Motion to Lift

Stay. Thereafter, the Debtor initiated the Adversary, and the Court issued an Order Consolidating Motion to Lift Automatic Stay and Response to Motion to Lift Automatic Stay with Adversary Proceeding (Bankr. Dkt. 50) on August 19, 2015. *See* FED. R. BANKR. P. 7001(1).

### C.      Confirmation of Amended Plan

On July 27, 2015, the Debtor filed a modified chapter 13 plan (the "Amended Plan") (Bankr. Dkt. 43) in which she proposed to pay nothing to the Defendants for the mobile home. On August 4, 2015, Laird filed the Objection to Modification of Plan (the "Objection to Amended Plan") (Bankr. Dkt. 47), opposing any modification of the Plan pending the Motion to Lift Stay or the Adversary. On September 29, 2015, the parties entered into an Agreed Order (Bankr. Dkt. 56) allowing the confirmation of the Amended Plan with two (2) additional provisions: (1) that $3,687.00 be collected for payment of Laird's claim but not paid to him and (2) that the Objection to Amended Plan be held in abeyance until resolution of the Adversary. With these changes to the Amended Plan, the Court entered the Order Confirming the Debtor's Plan, Awarding a Fee to the Debtor's Attorney and Related Orders (Bankr. Dkt. 60) on October 5, 2015.

### Adversary

The Debtor initiated the Adversary by filing the Complaint against the Defendants on July 1, 2015. In the Complaint, the Debtor asked the Court to avoid the purported sale of the mobile home as a "constructive fraudulent transfer" under § 522(g), § 522(h), § 548(a), and § 550. (Compl. at 3-4). She sought the turnover of the mobile home as property of the estate

under § 542.[8]  (Compl. at 5).  She alleged in the Complaint that the Defendants violated the automatic stay under § 362(a).  (Compl. at 3).  She asserted a separate state law claim for "intentional misrepresentation and fraud" and sought attorney's fees and punitive damages in connection with that claim.  (*Id*. at 4-6).

On July 6, 2015, the Defendants filed the Answer to Complaint and Demand for Jury (Adv. Dkt. 4), denying the Debtor's claims.  On August 14, 2015, the Defendants filed the Withdrawal of Jury Demand (Adv. Dkt. 9).

In the Pretrial Order, the Debtor abandoned her claim for violation of the automatic stay.  She cited § 548 and state common law as the basis for her claims in the Pretrial Order.  As damages, she sought the return of the Certificate of Title or, in the alternative, $10,000.00, the alleged value of the mobile home, pursuant to § 550.  In connection with her state law claim, she sought punitive damages of $10,000.00 and attorney's fees and expenses of $6,155.00, plus attorney's fees and expenses accruing after December 29, 2015.  The Defendants likewise asked for their attorney's fees and expenses but did not specify the legal authority for their request.  In the Pretrial Order, the issues of punitive damages and attorney's fees and expenses were reserved for a separate hearing contingent on the outcome of the Trial.

## Discussion

At Trial, the Debtor asserted two (2) causes of action based on fraud.  She alleged a constructive fraudulent conveyance claim under § 548 and a common law claim for fraud in the inducement.  The Court considers the § 548 claim first.

---

[8] The Debtor testified at Trial that she and her two (2) children have continued to occupy the mobile home.

**A.      § 548**

The Defendants argued at Trial that the Debtor lacks standing to challenge the purported sale of the mobile home under § 548.  Because the standing issue raises a jurisdictional question, it must be resolved as a preliminary matter.

### 1.      Standing

The Defendants argued that chapter 13 debtors generally may not exercise statutory avoiding powers.  On its face, § 548 grants only the trustee, not the debtor, the authority to avoid certain prepetition transfers.[9]  Although § 1303 grants chapter 13 debtors "the rights and powers of a trustee" under certain statutes, § 548 is not listed among them.[10]  Thus, according to the Defendants, the Debtor does not have standing under either § 548 or § 1303.  The Debtor asserted that notwithstanding the language of § 548 and the general rule that chapter 13 debtors lack standing to exercise the avoidance powers of a chapter 13 trustee, she has standing under § 548 pursuant to the narrow exception applicable to involuntary transfers of exempt property found in § 522(g) and (h).

Section 522(h) provides:

(h)      The debtor may avoid a transfer of property of the debtor . . . to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—

(1)      such transfer is avoidable under section 544, 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title; and

(2)      the trustee does not attempt to avoid such transfer.

---

[9] Section 548(a) provides, in pertinent part, "The *trustee* may avoid any transfer . . . of an interest of the debtor in property . . . ."  11 U.S.C. § 548(a)(1) (emphasis added).

[10] Section 1303 provides:  "Subject to any limitations on a trustee under this chapter, the debtor shall have, exclusive of the trustee, the rights and powers of a trustee under sections 363(b), 363(d), 363(e), 363(f), and 363(l), of this title."  11 U.S.C. § 1303.

11 U.S.C. § 522(h).   Section 522(g)(1) limits a debtor's avoidance rights by providing that a debtor may only exempt property recovered under § 522(h) if: (1) the transfer was not voluntary, and (2) the debtor did not conceal the property.   11 U.S.C. § 522(g).   Together, § 522(g) and § 522(h) allow a debtor to avoid certain involuntary transfers of exempt property if:   "(1) the transfer was not a voluntary transfer of property by the debtor; (2) the debtor did not conceal the property; (3) the trustee did not attempt to avoid the transfer; (4) the debtor seeks to exercise an avoidance power usually used by the trustee, listed within § 522(h); and (5) the transferred property is of a kind that the debtor would have been able to exempt from the estate if the trustee had avoided the transfer under one of the provisions in § 522(g)."   *Realty Portfolio, Inc. v. Hamilton (In re Hamilton)*, 125 F.3d 292, 297 (5th Cir. 1997) (citation omitted).

The Court finds that four (4) of the five (5) standing requirements are undisputed.   There is no evidence that the Debtor attempted to conceal the mobile home; the trustee has not attempted to avoid the sale of the mobile home to Laird; the Debtor seeks to avoid the purported transfer of the mobile home under § 548, listed within § 522(h); and the mobile home is the kind of property that the Debtor would have been able to exempt from property of the bankruptcy estate if the trustee had avoided the transfer under one of the provisions in § 522(g). The sole dispute over the Debtor's standing under § 548, therefore, is whether the sale of the mobile home was voluntary or involuntary.

The Code does not define the distinction between a "voluntary" or "involuntary" transfer. Bankruptcy courts, however, generally have held that a transfer is involuntary for the purpose of § 522(g) "if it occurred (1) by operation of law without consent; or, (2) if the debtor consented, but the consent was the product of fraud, material misrepresentation, coercion, duress or similar circumstances."   *In re Diamantis*, No. 13-11201, 2014 WL 1203182, at *5 (Bankr. N.D. Ohio

Mar. 24, 2014).  Thus, some transfers to which a debtor consents may still be considered involuntary where there is evidence of fraud.  Here, the sale of the mobile home did not take place by operation of law without the Debtor's consent but took place, if at all, because of the Debtor's signature on the Dec. 18 Bill of Sale, allegedly obtained by fraud.

The Debtor insisted that the transfer was involuntary because Laird fraudulently induced her into selling him the mobile home when she thought she was entering into a title loan with Franklin Check Service.  In Mississippi, fraud in the inducement "arises when a party to a contract makes a fraudulent misrepresentation, *i.e.*, by asserting information he knows to be untrue, for the purpose of inducing the innocent party to enter into a contract."  *Lacy v. Morrison*, 906 So. 2d 126, 129 (Miss. Ct. App. 2004).  A fraudulent inducement claim requires proof, by clear and convincing evidence, of the elements of a fraudulent misrepresentation claim as they relate to a contract.  *Id*.  The elements of a  fraudulent misrepresentation claim are:  (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) her reliance on its truth; (8) her right to rely thereon; and (9) her consequent and proximate injury.  *Id*.; *Great S. Nat'l Bank v. McCullough Envtl. Servs. Inc*., 595 So. 2d 1282, 1289 (Miss. 1992); *Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992).

The Debtor asserted that she has proved all of the elements of a fraudulent inducement claim.  According to the Debtor, Laird falsely represented to her that she was signing a promissory note for the purpose of obtaining a title loan on the mobile home when in fact she was signing the Dec. 19 Bill of Sale (later altered) conveying the mobile home to Laird.  This false representation, according to the Debtor, was material because she never would have signed

the Dec. 19 Bill of Sale if Laird had disclosed the true nature of that document. The Debtor insisted that Laird, being the owner of a title loan business, knew the difference between a promissory note and a bill of sale and intended that she rely on his false representation that the transaction was a title loan. His motivation, which he admitted to at Trial, was the profit he would make when he resold the mobile home. The Debtor maintained that she relied on Laird's representation and was justified in doing so. *Ill. Cent. RR Co. v. Harried*, 681 F. Supp. 2d 772, 777 (S.D. Miss. 2009) (in Mississippi, common-law fraud requires proof of justifiable reliance, a less exacting standard than reasonable reliance). As a result, she sustained the loss of the Certificate of Title to the mobile home.

The Defendants contended that there is no evidence of any fraudulent activity that would indicate that the Debtor involuntarily signed the Dec. 18 Bill of Sale. The Debtor signed the Dec. 18 Bill of Sale, received $2,500.00, and tendered the Certificate of Title to Laird. The Dec. 18 Bill of Sale, the Certificate of Title, and negotiated check are clear evidence that the transaction was a simple sale and purchase of the Debtor's mobile home, according to the Defendants.

In this "he said, she said" debate over the nature of the transaction, the Court finds the Debtor's testimony regarding the events of December 18 and December 19, 2014, more credible than the testimony of either Laird or Delozier. The Court renders this finding of credibility although the Debtor admitted on cross-examination that she was accused of insurance fraud during the pendency of her Bankruptcy Case. According to the Debtor, she received $12,500.00 from an insurance company after her home was destroyed by fire, and on July 20, 2014, she used these insurance proceeds to purchase the mobile home that is the subject of the Adversary. (State. of Fin. Affairs, Bankr. Dkt. 4 at 24). The Debtor explained that after an arson

investigation, the insurance company demanded that she return the proceeds, which she agreed to do in monthly installments.[11]  Notwithstanding the Debtor's troubling past, the Court found her to be a more credible witness than Laird or Delozier.

Based on the Debtor's testimony, the Court finds that Laird led her to believe she was entering into a $2,500.00 title loan with Franklin Check Service.  Indeed, Laird admitted at Trial that he initially discussed a $2,500.00 title loan with the Debtor.  From his conversation with the Banking Department, Laird knew that Franklin Check Service could lose its title loan license if it granted a title loan on a mobile home and he also knew that he could not grant the Debtor a title loan himself, so he transformed the title loan transaction to a purported sale to circumvent Mississippi law.[12]  It was reasonable for the Debtor to believe that she was agreeing to a title loan with Franklin Check Service because her conversations with Laird and Delozier took place at its office, Laird was its sole owner, and Delozier was its sole employee.  Also, providing Laird with the Certificate of Title was just as consistent with a title loan as with a sale.[13]  More significantly, the Court does not believe that the Debtor would have agreed to sell her mobile home for $2,500.00 when she had purchased it only five (5) months earlier for $8,700.00, had

---

[11] The Debtor's postpetition payment of a prepetition debt without prior approval from this Court will need to be reviewed by the chapter 13 trustee and the appropriate pleadings filed.

[12] The Mississippi Title Pledge Act prohibits any person from engaging "in business as a title pledge lender or otherwise portray himself as a title pledge lender unless the person has a valid license authorizing engagement in the business."  MISS. CODE ANN. § 75-67-419(1).

[13] The Mississippi Title Pledge Act provides, in pertinent part:

The title pledge lender shall take physical possession of the certificate of title for the entire length of the title pledge agreement, but shall not be required to take physical possession of the titled personal property at any time.

MISS. CODE ANN. § 75-67-403(h).

made repairs to the interior, and had no other place to live.  Indeed, the $2,500.00 purchase price paid by Laird's Body Shop is less than thirty percent (30%) of the amount the Debtor paid for the mobile home.[14]  In comparison, thirty percent (30%) is within the typical percentage range that a title lender will loan.  *Taming Title Loans*, 101 Va. L. Rev. 1753, 1756-57 (2015).

The parties' conduct after the transaction supports the view that the transfer was involuntary.  Laird admitted at Trial that he made no effort to take possession of the mobile home for four (4) months after he allegedly bought it.  When he did take action, he sought out the Debtor's father to complain that the Debtor owed him over $4,000.00, with interest.  Also, the Debtor made payments to Franklin Check Service in February and March, 2015 as if repaying a title loan.  Laird attempted to tie these payments to a payday loan obtained by the Debtor sometime in February 2013, but the Court finds it incredible that the Debtor would suddenly make payments to Franklin Check Service on a two (2)-year old payday loan.[15]  Laird would have the Court believe that the timing of these payments, made only months after the alleged sale of the mobile home, was a mere coincidence.  Conveniently, Laird testified that he only recently discovered the alleged delinquency.  Indeed, according to Delozier, Laird gave her the Debtor's file which supposedly included documents about the previously overlooked outstanding payday loan only the morning of the Trial.[16]  Because Franklin Check Service had a firm policy of not conducting business with customers with delinquent loans, the Court finds it unlikely that Laird would have considered her request for a title loan on the mobile home if she

---

[14] $8,700.00 × 30% = $2,610.00.

[15] The Mississippi Check Cashers Act, Miss. Code Ann. § 75-67-519, which governs payday loans, contemplates a loan period of only thirty (30) days.

[16] *See infra* note 5.

had an outstanding payday loan.  For all of these reasons, the Court believes the Debtor's testimony that she repaid the payday loan in full "several years ago."

Laird relied heavily on the Dec. 18 Bill of Sale as evidence that the transfer was voluntary.  But the date next to the Debtor's signature on the Dec. 18 Bill of Sale appears to have been altered, and the existence of the Dec. 19 Bill of Sale suggests that the Debtor signed it when the line at the top identifying her as the seller was left blank, and it was unsigned by Laird at the bottom.  Laird and Delozier both testified that the Dec. 18 Bill of Sale was kept in a safe at Franklin Check Service along with all other important documents, and only they had access to it. Yet neither could satisfactorily explain why there were two (2) different bills of sale.  The Court finds that the alteration of the Dec. 19 Bill of Sale is consistent with Laird's overall scheme to protect Franklin Check Service's title loan license.

Aside from the apparent alteration, it is questionable whether the Dec. 18 Bill of Sale is even valid under Mississippi law.  In Mississippi, a contract that is not sufficiently definite is unenforceable.  *Leach v. Tingle*, 586 So. 2d 799, 802 (Miss. 1991).  The main paragraph of the Dec. 18 Bill of Sale provides that "[t]he *Seller* hereby grants transfer or sale of the following goods . . . . to the *Seller*."  (Jt. Ex. 1).  The Defendants characterized the "Seller to Seller" provision as a mistake due to a scrivener's error and asked the Court to reform the Dec. 18 Bill of Sale.  Mississippi law, however, permits the reformation of a contract only when a mistake is mutual.  *Johnson v. Consol. Am. Life Ins. Co.*, 244 So. 2d 400, 402 (Miss. 1971) ("The mistake that will justify a reformation must be in the drafting of the instrument, not in the making of the contract.").  In the absence of an intent by the Debtor to sell the mobile home to Laird, the alleged mistake is not a basis for reformation under Mississippi law.  *A. Copeland Enters. v.*

*Pickett & Meador, Inc.*, 422 So. 2d 752, 754 (Miss. 1982) (holding that a court may not "draft a contract between two parties where they have not manifested a mutual assent to be bound").

Another ambiguity arises out of the obligation in the Dec. 18 Bill of Sale to maintain property insurance on the mobile home. *See Necaise v. U.S.A.A. Cas. Co.*, 644 So. 2d 253, 257-58 (Miss. 1992) (holding that an insurable interest must exist in an insured for an insurance policy to be effective). Laird asserted that because the duty to maintain insurance was only "Till Picked Up," it was not inconsistent with a sale of the mobile home. The time limitation, however, is just as consistent with a title loan where the insurance obligation could be interpreted as expiring when the Debtor either redeemed the Certificate of Title or Laird acquired the right to sell or dispose of the mobile home pursuant to the terms of the title loan.

In the Pretrial Order, the Defendants cited *Montoya v. Boyd (In re Montoya)*, 285 B.R. 490 (Bankr. D.N.M. 2002), in support of their position that the sale was a voluntary transfer for purposes of § 522(h). There, the bankruptcy court held that the debtor lacked standing to bring an avoidance action under § 548. *Montoya*, 285 B.R. at 493. But unlike the Debtor here, the debtor in *Montoya* did not allege fraud and could not show that the property in question would otherwise be exempt. Thus, *Montoya* does not support the Defendants' argument.

Accordingly, the Court finds that the Debtor has established that the Dec. 18 Bill of Sale was an involuntary transfer because her signature was obtained by fraud. The Court, therefore, finds that the Debtor has standing under § 522(h) to assert a constructive fraud claim under § 548.

### 2.    Constructive Fraud

A claim under § 548 may be founded on actual fraud or constructive fraud. 11 U.S.C. § 548(a)(1)(A), (B). The Debtor alleged only a constructive fraud claim under § 548(a)(1)(B),

which does not require proof of an intent to defraud. Under that provision, a transfer can be avoided if: (1) it was made within two (2) years before the date of the filing of the petition, (2) the debtor received less than a reasonably equivalent value in exchange for such transfer, and (3) the debtor was insolvent on the date that the transfer was made or became insolvent as a result of the transfer. 11 U.S.C. § 548(a)(1)(B)(i)-(ii). Indisputably, the sale of the mobile home occurred within two (2) years before the date of the Petition. The parties contested: (1) whether the Debtor received less than a reasonably equivalent value in exchange for the mobile home and (2) whether she was insolvent when the sale occurred or became insolvent as a result of the sale.

### a. Reasonably Equivalent Value

The Debtor testified that she bought the mobile home for $8,700.00 on July 20, 2014 and presented a bill of sale as proof of the purchase price. (Debtor Ex. 1). In her opinion, the minimum value of the mobile home was $10,000.00 at the time of the purported sale to Laird on December 18, 2014. The value of the mobile home increased after she bought it, according to the Debtor, because of certain improvements to its interior made before December 18, 2014. In her Plan, the Debtor likewise valued the mobile home at $10,000.00.[17] The Defendants contended that the Debtor's testimony at Trial regarding the value of the mobile home was self-serving and not credible. According to the Defendants, the value of the mobile home was $2,500.00 because that was the price Laird paid for it. The Defendants provided no other evidence of the value of the mobile home.

The Court accepts $10,000.00 as the fair market value of the mobile home on December 18, 2014 and finds that a mobile home worth $10,000.00 is not reasonably equivalent in value to $2,500.00. The Fifth Circuit has noted that reasonably equivalent value is lacking when a sale

---

[17] As previously noted, the Debtor valued the mobile home in Schedule B as $28,000.00 but admitted at Trial that she had no basis for doing so.

yields less than seventy percent (70%) of the fair market value of the property. *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201, 203 (5th Cir. 1980). Although the U.S. Supreme Court in *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994), rejected *Durrett*'s seventy percent (70%) rule, it limited its ruling to "mortgage foreclosures of real estate" conducted in compliance with state law. *Id.* at 537 n.3. Thus, *Durrett* remains instructive in determining reasonably equivalent value in the context of private sales. Here, the Debtor received $2,500.00 in a private sale of her mobile home, which is twenty-five percent (25%) of the value of the mobile home, well below *Durrett*'s seventy percent (70%) rule. Given the wide disparity between the purchase price and the fair market value of the mobile home and in light of the totality of the circumstances surrounding the alleged sale, including the Debtor's financial acumen based on her education and experience, the Court finds that the Debtor has met the first requirement of constructive fraud. The Court next turns to the second requirement, insolvency at the time of the transfer.

### b.    Insolvency

The Code defines insolvency using a simple "balance sheet" test, which compares the debtor's assets and liabilities at the time of the challenged transfer. *See* 11 U.S.C. § 101(32)(A) (insolvency is when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation"). A debtor is insolvent when her assets (excluding property that is exempt in the bankruptcy case and that is transferred, concealed, or removed with intent to hinder, delay, or defraud creditors) taken at a fair value, exceed her liabilities. 11 U.S.C. § 101(32)(A).

According to her bankruptcy schedules, the Debtor owned no real property, and the value of her personal property, which consisted of cash, household goods, clothing, jewelry, and a 2009 Ford Fusion, was less than $10,000.00. Nine (9) proofs of claims were filed in the Bankruptcy Case totaling $25,780.64. Thus, the Debtor's bankruptcy schedules and claims

register reflect that her liabilities exceeded her assets as of the date of the Petition on April 17, 2015.  At Trial, the Debtor's testimony confirmed the accuracy of the proofs of claims and bankruptcy schedules.  Also, she testified that after she allegedly sold the mobile home on December 18, 2014 and before she filed the Petition on April 17, 2015, she did not acquire any new assets or incur any new debts.  In other words, she testified that her overall financial condition on April 17, 2015 was the same as it was on December 18, 2014.

The Defendants pointed out at Trial that the Bankruptcy Case was commenced four (4) months after the purported sale of the mobile home, and the financial information in the bankruptcy schedules is not contemporaneous to the transaction in question.  Although the Defendants are correct about the nearly four (4)-month gap, the Defendants' argument ignores the Debtor's testimony at Trial that her financial condition essentially did not change.  Given her estimated monthly salary of $1,000.00 and her negative net worth of $15,928.64 at the time of the Petition, it is unlikely she was solvent when the alleged sale of the mobile home took place, even without her testimony stating so.  Accordingly, the Court finds that the Debtor was insolvent on the date of the transfer, and that she has met the second requirement of constructive fraud.[18]

### c.    Recovery under § 550

Having found that the Debtor received less than a reasonably equivalent value in exchange for the mobile home and that she was insolvent on the date of the sale, the Court finds that the Debtor has established constructive fraud under § 548(a).  The liability of a transferee of an avoided transfer under § 548 is governed by § 550.  Under § 550, a trustee is permitted to

---

[18] Because it is necessary under § 548(a)(1)(B) to establish only one of the two (2) alternatives related to insolvency, the Court does not consider whether the Debtor also became insolvent as a result of the alleged sale of the mobile home.

recover "the property transferred, or, if the court so orders, the value of such property . . . ." 11 U.S.C. § 550(a). The statute does not contemplate an award for monetary damages, but a court may award the return of the transferred property or its equivalent value. In the Pretrial Order, the Debtor sought the return of the mobile home, or if its return was not possible, then a monetary award of $10,000.00. The Debtor testified at Trial that she and her two (2) children currently occupy the mobile home, and it is thus unnecessary to return physical possession of the mobile home to her. In order to return ownership of the mobile home to the Debtor, the Court finds that the Debtor is entitled to recover the Certificate of Title from Laird. Finally, although the Debtor sued both Franklin Check Service and Laird, § 550 limits the Debtor's recovery to the initial transferee, which under these facts is Laird, not Franklin Check Service.

**B.      Intentional Misrepresentation and Fraud**

The Court already has found that the Debtor presented sufficient evidence that Laird committed fraud to establish that the purported sale of the mobile home was an involuntary transfer for purposes of § 522(g) and § 548. The Court finds that the same evidence establishes the elements of fraud in the inducement under Mississippi law. In short, the Court finds by clear and convincing evidence that the Debtor was induced to sign the Dec. 18 Bill of Sale based upon Laird's assertion that the document was in contemplation of a title loan when it purportedly constituted a conveyance of the mobile home. Laird understood that a title loan would be disclosed in any audit by the Banking Department and would jeopardize Franklin Check Service's license, so he disguised the title loan as a sale.

As to actual damages, the Court already has ordered the return of the Certificate of Title to the Debtor. The Debtor, however, also sought punitive damages and attorney's fees and expenses against both Laird and Franklin Check Service in the Complaint. These matters have

been reserved for a separate hearing.  To provide clarity to these future proceedings, the Court notes that a question arises as to the extent to which Franklin Check Service may be held liable under agency law principles for the action of its sole owner, Laird, when Franklin Check Service did not benefit from the sale of the mobile home. Although Laird insisted at Trial that Franklin Check Service was not a party to the sale of the mobile home, his portrayal of Franklin Check Service's role in the transaction was not entirely accurate.  The evidence showed that Laird used Franklin Check Service as a tool to perpetuate the fraud on the Debtor. There is also a question as to whether Mississippi law recognizes vicarious liability for punitive damages under these facts. The parties did not address these issues at Trial but will need to do so at the separate hearing.

**C.      Motion to Lift Stay**

As noted previously, the Trial of the Adversary was consolidated with the Motion to Lift Stay filed in the Bankruptcy Case.  At Trial, Laird asked the Court to grant him relief from the stay based on his purchase of the mobile home prior to the commencement of the Bankruptcy Case and on the Debtor's failure to maintain insurance coverage on the mobile home, in particular coverage against fire loss.  For the reasons discussed above, the Court finds that Laird has no ownership interest in the mobile home.  Because Laird did not assert a security interest in the mobile home in the Motion to Lift Stay and did not file a timely proof of claim in the Bankruptcy Case, the Court concludes that Laird is not a "party in interest," and, therefore, lacks standing to seek relief from the stay under § 362(d)(2).  Accordingly, the Court finds that the Motion to Lift Stay should be denied.

**D.      Objection to Amended Plan**

Given the disposition of the Motion to Lift Stay and the resolution of the Adversary, the Court will reset the Objection to Amended Plan for hearing in the Bankruptcy Case.  (Agreed Order, Bankr. Dkt. 56).  As mentioned previously, Laird objected to the Debtor's proposal in the Amended Plan to retain the mobile home and pay nothing either to him or Franklin Check Service.

## Conclusion

Based on the foregoing, the Court concludes that the Debtor has established a constructive fraud claim under § 548 and is entitled to recover the Certificate of Title to the mobile home under § 550.  The Court also concludes that the Debtor has proved fraud in the inducement under Mississippi law.  In short, the Court concludes there was no valid sale of the mobile home to Laird and no lawful title loan on the mobile home by Franklin Check Service.  By separate notice, the Court will set a hearing on the Objection to Amended Plan in the Bankruptcy Case and on the issues of punitive damages and attorney's fees and expenses with respect to both Defendants in the Adversary.  In contemplation of these hearings, the Court notes that in the absence of either a valid sale or enforceable security agreement, the Defendants are at best unsecured creditors of the bankruptcy estate without timely filed proofs of claims.  A final judgment will not be entered until final disposition of all matters in the Adversary.

##END OF OPINION##